## THE ADAMELLO.

District Court, E. D. Virginia. March 22, 1927.

**1. Contracts ⬅⇒313(1)—Unequivocal refusal to perform may be treated as "breach," and suit brought at once.**

Where one party to contract unequivocally refuses to perform, and communicates this refusal to the other party, the latter may treat the refusal as a "breach," and commence action at once.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Breach.]

**2. Shipping ⬅⇒51(2)—Letter from master to charterer, stating that failure to commence loading had rendered charter null and void, held not such unequivocal refusal to load as would support suit for breach of charter.**

Letter from the master of a vessel to the charterer, written six days after vessel was tendered for loading, stating that under the terms of the charter party failure to commence loading had rendered the charter null and void, held not such an unequivocal refusal to accept the cargo as would support a suit for breach of the charter party.

**3. Shipping ⬅⇒52—Charterer's failure to commence loading within time stipulated held not to render charter void.**

Failure of charterer to commence loading within time stipulated held not to render charter void, but to be compensated by demurrage.

In Admiralty. Suit by the Consolidated Coal Company, Inc., against the Italian Steamship Adamello. Decree for libelant.

Baird, White & Lanning, of Norfolk, Va., for libelant.

Hughes, Little & Seawell, of Norfolk, Va., for respondent.

GRONER, District Judge. The libel in this case is brought to recover damages for the alleged breach of a written charter party made July 29, 1926. By its terms the steamer Adamello agreed to carry a cargo of coal of not less than 7,600 tons from Norfolk or Newport News to a port on the west coast of Italy at $3.85 per ton freight. The steamer reported ready to load at noon on September 14, and on September 20, a berth not then having been furnished, her master gave written notice that the charter party

was void and of no effect, for failure to furnish cargo in accordance with paragraph 3 of the charter party.

Libelant thereupon immediately filed this libel, and the vessel was arrested and required to give bond for her release. The notice of the master referred to above was as follows:

"Norfolk, Virginia, September 20, 1926.

"By hand.

"The Consolidated Coal Company, Inc., National Bank of Commerce Building, Norfolk, Virginia—Gentlemen: Italian S. S. Adamello. This vessel, under my command, was tendered ready for loading and accepted at noon on the 14th instant. As loading has not yet begun, please note that under the terms of clause No. 3 (three) of the charter party, dated at Genoa July 29, 1926, said charter is null and void.

"Yours respectfully, F. Raggio,
"Master Italian S. S. Adamello."

As already stated, libelant regarded this notice as a refusal on the part of the master to receive the coal, and as a complete repudiation of the charter party, and filed proceedings alleging damages of $30,000 as a result thereof. The sole question, therefore, for determination on the pleadings as they now are, Was this letter an absolute refusal to perform the contract? for, unless it was, the suit was improvidently brought.

[1] I think the law is clear that, where a party to a contract unequivocally refuses to perform and equally unqualifiedly communicates this refusal to the other party, the other party may treat the refusal as a breach and commence action at once. It does not seem to me, however, that the letter quoted above may be construed as an unequivocal refusal to perform.

In Benjamin on Sales (2d Ed.) § 568, it is said that the mere assertion that the party will be unable or will refuse to perform his contract is not sufficient. In the case of Dingley v. Oler, 117 U. S. 490–502, 6 S. Ct. 850, 854 (29 L. Ed. 984), the language relied upon to justify suit for a repudiation of a contract to furnish ice was: "We cannot, therefore, comply with your request to deliver to you the ice claimed, and respectfully submit that you ought not to ask this of us, in view of the fact stated herein and in ours of the 7th." This language the Supreme Court ruled was not "so positive and unequivocal" as to justify action thereon.

[2] In this case there is nothing in the letter of the master of the vessel unequivocally declining to accept the cargo. At most, it is an expression of opinion on his part that, under the terms of the charter party, the failure to load the vessel within the six-day period has worked its cancellation. It was no more than a threat not to be bound by the contract, and it was not accompanied by any act on his part showing this purpose, such as preparing to take his vessel away, and indeed this is hardly thinkable under the circumstances, for it was only at this port that he could have reaped any advantage from cancellation, since it was only here that he could have gotten another cargo at the advanced rates. I am constrained, therefore, to hold that the libel was improvidently brought, and, except for what follows, should be dismissed.

[3] Since, however, the parties by stipulation have submitted to me as evidence a complete record of events occurring after delivery of the notice from the master and the bringing of the libel, and since also the argument has been made with reference to all of this, I think it proper and fair to all concerned to express the views which I entertain as a result of the consideration of this evidence, though, in view of the pleadings, it perhaps otherwise would not have been admissible.

It appears that at 4 p. m. of the 21st this libel was filed, and at 4:40 p. m. of the same day, and before the papers had been served or the ship arrested, the master of the Adamello addressed this further communication to libelant:

"Norfolk, Virginia, September 21, 1926.

"By hand at 4:40 p. m.

"The Consolidated Coal Company, Inc., National Bank of Commerce Building, Norfolk, Virginia—Gentlemen: In re charter party dated Genoa, July 29, 1926. As I advised you yesterday, this charter appears to be null and void under terms of clause No. 3 (three) thereof. I am accordingly cabling my owner, advising that no coal has been tendered to-day, and asking them for instructions. I will advise you to-morrow what action they instruct me to take. Yours respectfully, For and on behalf of Captain Raggio, Master of Italian S. S. Adamello, per R. T. Hasler."

This communication was followed by one from the libelant to the master of the Adamello and her agents in Norfolk, dated September 22d, at 4 p. m., acknowledging receipt of the above and offering to load 1,500 tons of coal which it then had on hand at Newport News, and at the same time stating that

2,000 additional tons would arrive that night, and the remainder, about 4,000 tons, the following day, and concluding as follows: "Upon the withdrawal of the cancellation notice and the acceptance of the cargo, the libel heretofore filed will be dismissed."

The libelant, the Consolidated Coal Company, has its principal place of business in New York City, and the special agents of the Adamello were Messrs. Simpson, Spense & Young, also of that city. The proceedings in Norfolk between the master and the local office of the libelant were doubtless reported by wire or phone by the local office of libelant to its principal office in New York City, and by the master of the vessel and its local agents in Norfolk to its special agents in New York, and the negotiations thereafter were conducted by the New York end rather than by the Norfolk end, and this doubtless resulted in much of the confusion which thereafter arose.

On September 22d the agents of the ship in New York delivered by hand a communication to libelant at its New York office in which they say:

"The owners of the above vessel have cabled us that, in order to avoid damage and delay, they are willing, without prejudice, to submit the question in dispute under the charter of July 29 to immediate arbitration in New York, leaving the arbitrators to decide whether the owners have the right to withdraw the ship, in which case you must agree in advance to pay the full current market rate. If, on the other hand, the arbitrators decide that the owners are not entitled to withdraw the ship, you will pay rates in accordance with the charter party. If you accept this agreement, the steamer can begin loading immediately."

To which libelant replied on the same date:

"We understand that you, by declaring the charter null and void, are not entitled to the arbitration clause therein contained. Inasmuch as we have already instituted suit, we feel that the dispute can best be settled in that way, and consequently we decline your offer to arbitrate."

On the 23d day of September, the ship's agents addressed the further communication to libelant's New York office, in which they first referred to the letter of the 22d from the Norfolk office of libelant to the master of the vessel and her Norfolk agent, and continued as follows:

"In that letter you offer to load immediately 'about 1,500 tons,' the remainder of the cargo to arrive and be loaded promptly. You say 'upon the withdrawal of the cancellation notice and the acceptance of the cargo, the libel heretofore filed will be dismissed.'

"No cancellation notice has been given you, either by or on behalf of the ship or her owners. In fact, you libeled the ship before the master had an opportunity to obtain his owners' instructions as to what course he should take."

Following the last paragraph were two paragraphs of an argumentative character, concluding with the following:

"However, entirely without prejudice, and solely with a view to reducing the damage in the event it should be decided that the charter is still in force, we hereby offer this steamer to you for immediate loading as soon as the owners can furnish bond to release her, on the same terms set forth in the original charter, excepting that the freight shall be at the current rate."

The offer contained in the last paragraph of this letter was accepted by libelant by letter addressed to the New York special agents of this steamer on September 24th, and acceptance being stated to be without prejudice to the rights and contention of both parties in the suit now pending, and on September 25th acknowledging notice from the captain of his readiness to load, libelant's Norfolk agent wrote as follows:

"Acknowledging yours of yesterday which came at 4:10 p. m., the steamer is to be loaded in accordance with the arrangement arrived at on yesterday in New York; that is to say, a new charter party is entered into upon the conditions contained in the charter party of July 29, 1926, except that the freight rate is $7 per ton, instead of the sum named in that charter party. This arrangement is to be without prejudice to the rights of the parties under the charter of July 29, and in the pending litigation."

As a result of the agreement, the vessel docked at Sewell's Point (rather than Newport News) at 6:15 p. m. on September 25th, and completed loading at 2 p. m. on September 27th. While it is entirely true that the libel does not plead any of these matters, and the libelant there rests its case solely on the first communication of the master of the Adamello, it is also true that, while the *answer* to the libel denies that the master refused to load, it sets up as an affirmative defense the loss by libelant of its rights under the charter party for failure to load within the six-day period, because of an embargo on the

railroad or from some other cause specifically enumerated in paragraph 3 of the charter party. ·

It would seem, therefore, proper, for the reasons I have given above, to consider whether this position is well taken. Paragraph 3 of the charter party provides that the cargo is to be loaded at the average rate of 1,500 tons per running day, commencing 72 hours after the steamer is ready to load, but demurrage is not to run against the charterer as to . time lost "through riots, strikes, lockouts, or any dispute between masters and men occasioning a stoppage of pitmen, trimmers, or other hands connected with the working or delivery of the coal for which the steamer is stemmed, or by reason of accidents to mines or machinery, obstructions, embargo or delay on the railway or at the loading piers, * * * or any other cause beyond the control of the charterers."

These exceptions obviously are intended for the benefit of the charterer. On the other hand, for the benefit of the owner, it is provided: "In the event of any stoppage or stoppages arising from any of these causes, continuing for the period of six running days from the time of the vessel being ready to load, this charter shall become null and void."

It will be seen at a glance, therefore, that the question to be determined is whether the delay of more than six days in loading the Adamello after her master reported her ready for cargo was due to "any stoppage or stoppages arising from one or more of the causes named above." The stipulation submitted by agreement of counsel shows that the Chesapeake & Ohio Railroad Company, on whose road libelant's coal was transported, had established an embargo on June 24, 1926, which lasted until November 1st of that year. It clearly appears, however, that the embargo was not absolute or unconditional. It was applicable first to one coal field and then to another, and grew out of the unusual amount of coal offered to the railroad during the period mentioned. Since it could not accept and promptly transport all coal offered, it availed itself of its right to establish these partial embargoes; but the papers filed by agreement of counsel show that, as to the coal of this particular libelant, there was never any embargo at all. It was received as offered and transported promptly, and arrived and was ready for delivery to the ship in the ordinary period required for transportation from the mines to tidewater.

Not only, therefore, was there no "stoppage," so far as the delivery of coal generally is concerned, because coal was moving all the time over the railroad, and the effect of the embargo was no more than to limit the deliveries to the ability of the railroad to transport them, but as to this particular libelant there was no stoppage at all. Its first shipment intended for delivery to the Adamello was received September 13, the day before the ship reported ready. This consisted of 2,803 tons. The balance of the 7,000-odd tons left the mines between September 14 and September 17, and all was received and ready for delivery to the ship by September 26. It is therefore unnecessary to discuss the legal effect of the language used in paragraph 3 of the charter party as to the meaning of the word "stoppage," but that it does not and could not embrace such a condition as obtained here with reference to libelant is necessarily admitted, but respondent has argued that this question is no longer pertinent to the issue here; that libelant, in bringing his suit, rested his case upon the proposition that the contract had been wrongfully breached by respondent, and thereafter made a new contract agreeing to pay the additional freight money unless he should be able to prevail in the litigation which he had provoked. In other words, that if the court should be of opinion that the first letter of respondent's master was ·not in contemplation of law a breach of the contract, libelant, by agreeing to be bound by the result of his suit, is wholly without remedy to collect back the difference between the original freight rate and that actually paid.

In my opinion this position is unsound, because in the letter of September 25 to the master of the ship, under which the cargo was loaded and transported, all rights under the original charter party were specifically reserved, and, while this is perhaps not shown to the same extent in the letter of the previous day, I think it is perfectly clear that the parties themselves contemplated just this, and nothing more. But, beyond all of this, it would, I think, be inequitable in the highest degree to say in one breath that neither party had done any act to justify the cancellation of the contract, and in the next that through a misunderstanding that result was accomplished. Everything that the parties originally intended has occurred just as it was contemplated it should, except that there was a few days' delay in the arrival of the cargo at the loading port. The ship arrived on time, and, except for this slight delay, loaded promptly and transported the identi-

cal cargo for which she was employed, and delivered the same in accordance with the terms of the original contract. The master, out of an abundance of precaution, advised the shipper of his interpretation of the contract, which, as it turns out, was incorrect. The shipper, mistakenly construing this as a refusal to load, brought suit prematurely, and then the parties, in order to save damage and loss, agreed that the original contract might be, and it was, carried out according to its terms in all save the amount to be charged for the service, and this they agree, as I construe their purpose, to leave for determination to a court of competent jurisdiction.

Hence it would seem to be now proper to put the parties in statu quo, and to this end each may be permitted to amend the pleadings, and if and when this is done a decree should follow, finding that the respondent recover his costs, including the cost of his bond for releasing the vessel from arrest; that the libelant have a decree against the respondent for the amount of the additional freight paid over and above the rate stipulated in the original charter party, less demurrage accruing between noon of the 17th and the stipulated time for loading and the actual time in which the ship was loaded.

In reaching the last conclusion, I ought to say that in my opinion this delay was primarily attributable to the improvident action of libelant, as well as the delay in the arrival of the cargo, and the loss should fall on it.